## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **MARK HAMMERVOLD;** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | **No. _____** |
| **v.** | § | |
| | § | |
| **LARRY BECKWITH;** | § | |
| | § | |
| **Defendant** | § | |
| | § | |

## COMPLAINT

The Plaintiff, Mark Hammervold ("Hammervold"), states as follows to the Court in support of his causes of action against Defendant Larry Beckwith ("Beckwith"):

## INTRODUCTION

1.     Plaintiff Mark Hammervold ("Hammervold"), an attorney, represented Defendant Larry Beckwith ("Beckwith") as a plaintiff in a civil lawsuit, in which Beckwith asserted highly-valuable claims worth millions of dollars against a third party, Lattimore Black, Morgan, & Cain, PC.  Hammervold represented Beckwith pursuant to an Engagement Agreement that would have entitled Hammervold to a contingency fee, but Beckwith terminated the representation after Hammervold spent hundreds of hours, and materially advanced Beckwith's claims, over more than three years. After terminating the representation, Beckwith wrongfully claimed to owe Hammervold nothing, and refused to even reimburse Hammervold for the expenses that Hammervold personally advanced on Beckwith's behalf. Hammervold now brings this action to establish that he is entitled to compensation for the services he rendered, and expenses he advanced, for Beckwith's benefit based on quantum meruit, and to recover an appropriate amount of compensation for same.

1

## <u>VENUE, JURISDICTION, AND PARTIES</u>

2.      Plaintiff Mark Hammervold ("Hammervold") is an adult citizen, resident and domicile of Illinois.

3.      Defendant Larry Beckwith ("Beckwith") is an adult citizen, resident, and domicile of Tennessee.

4.      The amount in controversy in this action exceeds $75,000.

5.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

6.      Venue is proper in this judicial district because: (a) the events at issue in this case occurred in this judicial district; and (b) Beckwith resides in this district.

7.      This lawsuit is a fee dispute between Hammervold, an attorney, and Beckwith, a former client. Under Tennessee law, it is appropriate for Hammervold to pursue his claims in this separate proceeding, rather than in the underlying case where Hammervold previously represented Beckwith. *See Starks v. Browning*, 20 S.W.3d 645, 652-653 (Tenn. Ct. App. 1999).[1]

## <u>FACTUAL BACKGROUND</u>

### a.  Mark Hammervold's Professional Background

8.      Hammervold earned his B.A. from Northwestern University in 2008 and his J.D. from Vanderbilt University Law School in 2012.

9.      Hammervold became licensed to practice law in Tennessee in 2012 and became licensed to practice in Florida and Illinois in 2013 and 2015, respectively.

10.     Hammervold started working at the law firm of Gideon, Cooper & Essary, PLC during law school, and then continued practicing there as an attorney, full-time, after graduation.

---

[1] While Hammervold has an attorney's lien on any money or property that may be paid into the court in the underlying proceeding by virtue of his substitution as counsel of record, *see* Tenn. Code Ann. § 23-2-102, this does not obviate the availability, or need, for a separate proceeding to adjudicate Hammervold's claims or Beckwith's defenses. *See Schmitt v. Smith*, 2001 Tenn. App. LEXIS 866, *5-6 (Tenn. Ct. App. Nov. 27, 2001).

2

11.     In the late Summer of 2015, Hammervold left Gideon Cooper and started his own independent law practice. During this period of time, Hammervold regularly associated with the law firm Cummings Manookian, PLC as co-counsel to work on certain plaintiffs' cases. For contingency fee cases, like the underlying case at issue (*Larry Beckwith v. Lattimore Black, Morgan & Cain, P.C.*, Williamson County, TN Circuit Court, No. 2016-40) the client would be informed, and would approve, that Hammervold would be working on the case as co-counsel. The client would then execute a single contingency fee agreement that would explicitly authorize Cummings Manookian and Hammervold to split the attorney fee. The split of the contingent attorney fee would be determined later among the attorneys and approved by the client, based on the factors required by the applicable rules of professional responsibility, including, most importantly, the amount of time and responsibility undertaken by each of the lawyers involved in the case.

### b.  Larry Beckwith's Accounting Malpractice Claim Against Lattimore.

12.     Beckwith is the majority shareholder of a successful company called LBDB Holdings, LLC, f/k/a Eco Energy Holdings, Inc. ("LBDB").

13.     In 2011, Beckwith and LBDB hired an accounting firm, Lattimore Black, Morgan, & Cain, PC ("Lattimore"), to value LBDB's common stock and stock options for financial reporting purposes.

14.     In order to perform the valuation, Lattimore requested and received voluminous financial documents from LBDB. Lattimore thereafter delivered its valuation report on May 3, 2011. That report drastically overstated the value of LBDB.

15. In connection with its work for LBDB, Lattimore had a professional, statutory, and contractual duty to maintain the confidentiality of the information it received from LBDB, as well as the valuation it performed.

16. In 2014, Beckwith was a defendant in a civil lawsuit. The nature of the claims against Beckwith in the case were such that disclosure of the existence and substance of Lattimore's drastic over-valuation of LBDB would create enormous exposure and settlement pressure on Beckwith.

17. By June 2014, Beckwith was closing in on obtaining a final judgment in his favor in the lawsuit. The trial court had ruled in his favor and the opposing party had been forced to take an appeal to the Tennessee Court of Appeals that was unlikely to succeed.

18. On or about June 24, 2014, an attorney for an adverse third-party co-defendant in the lawsuit was calling accounting firms, in search of an accounting consultant to assist the co-defendant against the plaintiff and Beckwith in the case. In doing so, he called Lattimore and spoke with a Lattimore accountant who had performed the 2011 valuation of LBDB.

19. In violation of Lattimore's professional and contractual duty of confidentiality to Beckwith, the Lattimore accountant disclosed to that attorney that (1) Lattimore had performed a valuation of LBDB; and (2) the finding that Lattimore had made in that valuation. The accountant was an agent of Lattimore and acting on behalf of Lattimore at the time of the disclosure.

20. The third-party co-defendant's attorney thereafter filed a declaration in the lawsuit, outlining the details of Lattimore's 2011 valuation of LBDB, as the Lattimore accountant had recounted them to him.

21. As a combined result of Lattimore's drastic overvaluation of LBDB and its wrongful disclosure of that confidential valuation to the third-party attorney, Beckwith suffered

4

significant damages, in the range of millions of dollars. *See* **Exhibit A** (███████████████████████)

███████████████████████████████████

22.    Lattimore's conduct in disclosing this confidential information constituted accounting malpractice.[2] Beckwith had a meritorious and highly-valuable accounting malpractice claim against Lattimore that accrued on July 28, 2014 (when they first learned of the disclosure).

23.    All of LBDB and Beckwith's claims against Lattimore were subject to the one (1) year statute of limitations for accounting malpractice. *See* Tenn. Code Ann. § 28-3-104(c)(1); *Beckwith v. LBMC, P.C.*, 2019 Tenn. App. LEXIS 138, *6-11 (Tenn. Ct. App. Dec. 6, 2017). As such, those claims were set to become time-barred on July 28, 2015.

24.    On April 23, 2015 – about three (3) months before the statute of limitation was due to run – Beckwith, through counsel, notified Lattimore of claims for damages suffered due to Lattimore's breaches of confidentiality. Beckwith and his then-Counsel did not assert any claims on behalf of LBDB at that time.

25.    Six days later, on April 29, 2015, Beckwith and Lattimore entered into a Tolling Agreement to "toll" the "running of time under any statute of limitations" from April 29, 2015 to August 14, 2015. This Tolling Agreement was modified four times, with the final modification extending the tolling period through January 22, 2016.

26.    When negotiating this Tolling Agreement, Beckwith and his then-Counsel made a deliberate choice not to make LBDB a party to the Tolling Agreement, and therefore, not to preserve LBDB's claims against Lattimore.[3] As a result of that choice, LBDB's claims against Lattimore became time-barred on July 28, 2015.

---

[2] Lattimore's conduct was actionable only through a professional accounting malpractice claim. *See Beckwith*, 2019 Tenn. App. LEXIS 138, *7-11.

[3] Based on information and belief, Beckwith made a deliberate choice not to preserve LBDB's claims because the damages he suffered were of a personal nature, and not suffered by, or chargeable to, LBDB.

27.     Under the final version of the Tolling Agreement, Beckwith had until March 23, 2016 to file his accounting malpractice claim against Lattimore.[4][5]

### c. Beckwith Retains Brian Manookian and Hammervold.

28.     In January 2016, Beckwith contacted Brian Manookian ("Manookian") about retaining him to prosecute his accounting malpractice claims against Lattimore on a contingency fee basis.

29.     Based on information and belief, Manookian expressed that he was interested in taking on the case, but that he would want to bring in and work with Hammervold as cocounsel, with whom Manookian would split the contingency fee. Beckwith understood and approved of this arrangement, and later executed an Engagement Agreement memorializing same.

30.     On January 18, 2016, Beckwith executed a written Engagement Agreement retaining Manookian and Hammervold and outlining the terms of the representation and contingency fee structure. A copy is attached as **Exhibit B**.

31.     The Engagement Agreement made clear that Manookian and Hammervold would work on the case together and would split the contingency fee. By signing the Engagement Agreement, Beckwith memorialized that he understood and approved of this arrangement. While the Engagement Agreement did not specify the exact split of the fee between Manookian and Hammervold, this was because the split was to be determined based on the amount of time and responsibility undertaken by Manookian and Hammervold in connection with the representation.

---

[4] At the time Beckwith and Lattimore entered into the Tolling Agreement, Beckwith had sixty (60) days under the statute of limitations to file his claim. Once the tolling period ended on January 23, 2016, Beckwith's sixty (60) days time under the statute of limitations began to run again. March 23, 2016 was sixty (60) days after January 23, 2016. *See Beckwith*, 2019 Tenn. App. LEXIS 138, *7-11.

[5] The Tolling Agreement only preserved Beckwith's claims against Lattimore based on Lattimore's disclosure of the valuation. Any other malpractice claims against Lattimore became time-barred on July 28, 2015.

32.     In the Engagement Agreement, Beckwith expressly recognized, and agreed, that although he had the right to change attorneys or to discharge Manookian and Hammervold, he remained responsible for all costs and expenses incurred prior to sending notice of such termination and further, and would be responsible for paying a reasonable fee, based on quantum meruit, if the representation was terminated before the end of the case.

> **d. Hammervold Spends Hundreds of Hours Representing Beckwith for Over Three Years, including through a Successful Appeal Resulting in the Reversal of an Erroneous Grant of Summary Judgment, but Beckwith Claims to Owe Hammervold Nothing After Terminating the Representation.**

33.     After Beckwith retained them, Manookian and Hammervold drafted and filed his accounting malpractice lawsuit against Lattimore in the Circuit Court for Williamson County, TN.

34.     Hammervold took primary responsibility for drafting the complaint and Manookian and Hammervold then decided they would file the complaint on January 22, 2016.

35.     But, on the morning of January 22, 2016, Manookian called Hammervold because there was a blizzard in Nashville, it had become dangerous to drive, and the Williamson County Clerk's office would be closing soon. Manookian had previously called the Clerk's office and they gave Manookian permission to file the complaint by fax, and then come in later to pay the filing fee, and to provide a substitute original complaint with a "wet" signature.[6]

36.     So – before the Clerk's office closed – Hammervold (who lived in Illinois) signed the complaint and fax-filed it per the Clerk's instructions. Immediately thereafter, Hammervold called the Clerk's office and confirmed (1) the instructions they had given Manookian; (2) that they had received the fax-filed complaint; and (3) that the fax-filed complaint would be time-stamped and deemed filed as of January 22, 2016.

---

[6] Williamson County has since adopted electronic filing, but it was not available at that time.

7

37.     Beckwith's complaint against Lattimore was filed on January 22, 2016 at 9:34 am, as reflected by the Clerk's official timestamp.[7]

38.     The Clerk's Office thereafter sent a fax to Hammervold and Manookian at 10:56 am on January 22, 2016, confirming that Beckwith's complaint had been filed at 9:34 am.

39.     Hammervold then spoke with Manookian after confirming that the Clerk's office had received the emergency fax. Manookian confirmed that he would take care of dropping off the original complaint and paying the fee.

40.     Lattimore retained attorney John Day to represent it against Beckwith's claims. Lattimore was served with a copy of the complaint through Mr. Day (who accepted service), within hours of that complaint being filed on January 22, 2016.

41.     The Williamson County Circuit Court Clerk maintains a Document Management System.[8] Despite filing the complaint on January 22, 2016, the Clerk did not enter the Plaintiffs' complaint into its Document Management System until January 26, 2016, when it received the filing fee and a substitute copy of the complaint with a "wet" signature.

42.     In professional liability litigation, it is very common for the defendant to file a dispositive motion and to attempt to obtain dismissal of a case, even when the arguments for dismissal are very marginal and unlikely to succeed. Responding to such motions is an expected and typical aspect of representing a plaintiff in a professional liability case. Even when a dispositive motion is based on a weak or incorrect argument, getting past those dispositive motions

---

[7] Debbie Barrett (Circuit Court Clerk for Williamson County), Angie Williams (Deputy Clerk for Williamson County), and Anne Ridens (Deputy Clerk for Williamson County) all later testified under oath that the complaint was filed on January 22nd, 2016 at 9:34 am.

[8] The time and date that a pleading is entered into the Document Management System is not indicative of the time and date the pleading is filed. The Williamson County Circuit Court Clerk's Office sometimes enters pleadings into the Document Management System after they are stamped filed and there are all types of reasons that a pleading may not be entered into the Document Management System on the day that it is filed.

and/or obtaining reversal of an order erroneously dismissing a plaintiff's claim creates significant value for a client pursuing a professional liability claim.

43.     On February 19, 2016, Lattimore filed a motion to dismiss and a motion for summary judgment. In those motions, Lattimore sought dismissal and/or summary judgment of Beckwith's accounting malpractice claim based on (1) a claimed deficiency of service and (2) an argument that the claim was time-barred because it was not properly "commenced" under Tenn. R. Civ. P. 3 until January 26, 2016.[9] Lattimore argued that the Tolling Agreement imposed a contractual filing deadline of January 22, 2016, and that Beckwith had missed that deadline due to the unusual circumstances by which the complaint was filed due to the inclement weather. Both of those arguments were meritless, both factually and legally.

44.     Manookian and Hammervold drafted and filed responses to Lattimore's dispositive motions.

45.     With respect to the service of process issue, Lattimore withdrew its argument for dismissal after reviewing Beckwith's response, in advance of the motion hearing.

46.     Manookian then appeared on Beckwith's behalf for the hearing on the motion to dismiss.

47.     On August 5, 2016, Judge Michael Binkley granted Lattimore's motion for summary judgment. Judge Binkley erroneously adopted Lattimore's argument that Beckwith's claim against Lattimore was time-barred because it was not "filed" on January 22, 2016. Judge Binkley also granted summary judgment against Beckwith's claim on the basis that Lattimore's

---

[9] Lattimore's motion also contained other arguments and bases for dismissal, but they are not material to this lawsuit. For example, Lattimore correctly argued that LBDB's claims became time-barred on July 28, 2015 because LBDB was not a party to the Tolling Agreement.

9

duty of confidentiality was owed only to LBDB, and not to Beckwith – even though Lattimore did not argue this and it was legally and factually wrong.

48.     After Judge Binkley's August 5, 2016 order, Hammervold took over near exclusive responsibility in representing Beckwith.

49.     Hammervold prepared and filed a motion to alter or amend judgment on September 2, 2016. The motion sought to correct Judge Binkley's errors in granting summary judgment on Beckwith's accounting malpractice claim.

50.     Hammervold then traveled from Chicago to Williamson County, Tennessee on November 17, 2016 and appeared on Beckwith's behalf during the hearing on Beckwith's motion to alter or amend.

51.     At the hearing on November 17, 2016, Judge Binkley was highly complimentary of Hammervold and his oral argument on Beckwith's behalf,[10] but indicated that he was likely going to rule against Beckwith's motion to alter or amend in a forthcoming written order. ████

████████████████████████████████

52.     After the hearing, on or around November 21, 2016, Beckwith's in-house counsel, Harold Donnelly ("Donnelly"), contacted John Day directly, about suing Manookian and Hammervold for legal malpractice and about settling Beckwith's claims with Lattimore. Neither Beckwith nor Donnelly gave any notice to, or sought any audience with, Hammervold or Manookian before deciding to reach out directly to John Day. Hammervold only learned about the direct communication with Mr. Day because Mr. Day was uncomfortable discussing settlement directly with Donnelly without Hammervold's permission.

---

[10] Judge Binkley stated on the record about Hammervold: "Respectfully, you do a great job; clear, succinct, to the point. I may disagree with you, but I respect your argument, and I respect the way you present your argument and I think it's important that you know that's the way I feel about it. You're an excellent lawyer."

53. Hammervold also first learned through his November 21, 2016 discussion with Mr. Day that Beckwith was contemplating and/or threatening to file malpractice claims against him and/or Manookian.

54. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

55. On January 31, 2017, Beckwith, Hammervold, and Manookian entered into a tolling agreement. The tolling agreement tolled the statute of limitations for Beckwith's potential legal malpractice claims indefinitely, until one or more party provided a notice to terminate the agreement.

56. On April 17, 2017, Judge Binkley entered an order granting in part and denying in part Beckwith's motion to alter or amend. Judge Binkley vacated the portion of his order granting summary judgment on the basis that Beckwith was not an intended third-party beneficiary. But, Judge Binkley denied the motion to alter or amend as to the statute of limitations issue.

57. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

11



58. ████████████████████████████████████████████████

████████████████████████████████████

59. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

60.     Shortly after that call, Hammervold prepared a notice of appeal and sent it by certified mail for filing. Hammervold thereafter confirmed that the notice of appeal was received and timely filed on May 11, 2017 before the deadline. Hammervold then worked with Beckwith and his in-house counsel on preparing and filing the required cost bond.

61.     Hammervold represented Beckwith throughout the appeal of *Beckwith v. LBMC, P.C.*, No. M2017-00972-COA-R3-CV.

62.     On June 9, 2017, Hammervold filed a notice that he should be designated as lead counsel in the appeal. He also prepared and filed a notice that no additional transcripts will be filed per Rule 24(d). Hammervold provided copies of both notices to Hankins, Donnelly and Beckwith.

63.     ████████████████████████████████████████████████



---

[11] ████████████████████████████████████████████████████████

████████████████████████████████████████████

64. 

65.

66. 

67.

*See* **Exhibit C**.

68.

69.

---

[16] *See* Exhibit C for the email chain communications discussed in ¶¶ 68-73.

14

involved in the drafting or filing of the complaint. I have had no involvement in any court appearance in this case. I have had no involvement in any of the appellate activity. I have never met with or even personally spoken to Mr. Beckwith. I've made these statements to Mr. Donnelly multiple times during the course of this. I haven't filed a motion to withdraw in the trial court because once the appeal process started activity in the trial court was stayed. I intend to do so as soon as I have the opportunity since my involvement has been so minimal and Mr. Beckwith is ably represented by Mr. Manookian and Mr. Hammervold.

70.

71.

72.



73. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.

74.      Hammervold finished and filed the appellant brief on August 21, 2017, and sent a copy to Hankins, Donnelly, and Beckwith.

75.      Lattimore filed their appellee brief on September 20, 2017. Upon receiving Lattimore's brief, Hammervold expected that he would prepare a reply brief, and filed an unopposed motion for an extension of time to do so (to accommodate a previously-planned trip to China), which was granted.

76.      On September 25, 2017, Hammervold provided Beckwith, Donnelly and Hankins with a copy of Lattimore's appellee brief and the order granting the extension.

77.      ████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[17] *See e.g., In re Estate of Fetterman v. King,* 2004 Tenn. App. LEXIS 556, *8 (Aug. 26, 2004) ("In this case, there was no clear and definite expression of the parties' intent to extinguish the 20% agreement.").



78. ██████ ██████ ██ ████ ██ ██ ████████ ███ ██ ████ ██████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████

79.     On December 6, 2017, Hammervold traveled from Chicago to Nashville for the oral argument before the Tennessee Court of Appeals.

80.     ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████

81.     The appeal remained pending for over a year after oral argument, but Hammervold still spent additional time working on the case during this period. In addition to responding to Beckwith's requests for updates, Hammervold received and reviewed serial notices of supplemental authority filed by Lattimore's counsel. Hammervold also spent hours reviewing the cases cited by Lattimore, as well as searching for potential supplemental authorities worthy of filing a Rule 27(d) notice on Beckwith's behalf.

82.     On March 21, 2019, the Court of Appeals issued an order reversing summary judgment, and remanding the case back to the trial court level to proceed. It was an unequivocal win for Beckwith.

---

[18] ████████████████████████████████████████████████
████████████████████████████████████████████████

83. 

84.

85.

86.

87.

88.     The same day, Hammervold discussed the call with Manookian. Since Hammervold had done nearly all of the work representing Beckwith, had spent hundreds of hours working on the case, and had singlehanded achieved such a great result for the client through the appeal, Manookian agreed to assign the entire portion of the contingency fee to Hammervold.

89.     Hammervold then sent an email to Koju on April 18, 2019 outlining the basis for his quantum meruit claim, and presented a confidential settlement offer pursuant to FRE 408 if Beckwith decided to terminate the Engagement Agreement.

90.     On April 26, 2019, Hammervold had not heard back from Koju about whether Beckwith would be terminating the attorney-client agreement or not, and sent a follow-up email:

Stacey,

I have not heard back from you. Can you please respond by letting me know what Larry wants to do, including whether he is terminating me from representing him. I need to know the latter ASAP.

Thanks,

Mark

91.     On April 29, 2019, Koju responded: "I will try to resolve this by tomorrow." After Hammervold followed up again on April 30, 2019, Koju responded: "I will send you an email by tomorrow." After Hammervold followed up again on May 1, 2019, Koju responded "Just a quick note to let you know that I am offsite at a client's board meeting through tomorrow afternoon and not ignoring your email. If I can, I will get something to you tonight, and if I cannot then certainly Friday as soon as the meeting ends."

92.     After Hammervold followed up again on May 6, 2019, Koju finally provided a substantive response later that day, stating: "Mr. Beckwith would not like to proceed with your representation of him in the LBMC Litigation."

93.     In her May 6, 2019 email, Koju also indicated that Beckwith was taking the position that he owed Manookian and Hammervold nothing because: (1) she claimed Manookian had terminated the Engagement Agreement on August 19, 2017 through his 10:01 pm email "and as a result of [Manookian's] suspension from the practice of law"; and (2) "An appeal of the trial court's decision in the LBMC Litigation was necessitated because the court determined that the initial filing was untimely as a result of Cummings Manookian's error and/or omission. All of the appellate work was done to avoid malpractice as a result thereof."

94.     Beckwith's reasons for denying Hammervold's quantum meruit claims were completely meritless.

95.     Koju's claim that Hammervold was not entitled to a quantum meruit fee from Beckwith because Manookian had supposedly terminated the Engagement Agreement in 2017 was clearly incorrect. First, Manookian's August 19, 2017 email cannot reasonably be interpreted as a novation or termination of the Engagement Agreement. Second, Beckwith did not *contemporaneously* understand Manookian's email as a termination of the attorney-client relationship or engagement because he continued to expect, and to instruct, Hammervold to perform work on his behalf as his attorney after receiving that email for over a year thereafter. Even in April 2019, ████████████████████████████████████████████████ ████████████████████████████████. Beckwith only re-interpreted Manookian's August 19, 2017 email as terminating the attorney-client engagement – nearly two years after the fact – when Hammervold asserted a quantum meruit claim, and would not relinquish it for a lowball offer. Third, Koju's claim that the Engagement Agreement was terminated due to Manookian's "suspension" contradicts, and demonstrates the lack of credibility of, Beckwith's claim that Manookian terminated the Engagement Agreement on August 19, 2017 because Manookian was

not suspended from practicing law until over a year *later* on September 21, 2018.[19] Finally, even if Manookian and/or Hammervold had initiated the termination of the engagement/representation, as opposed to Beckwith, Hammervold would still be entitled to compensation for his work under a quantum meruit theory under Tennessee law. *See e.g., See Miltier v. Bank of Am., N.A.*, 2013 Tenn. App. LEXIS 419, *14-15 (Tenn. Ct. App. Jun. 26, 2013) (affirming quantum meruit award of fees to attorney who withdrew from representing client); *Madison Tire Co. v. Weaver*, 1986 Tenn. App. LEXIS 3427, *3, 7-8 (Tenn. Ct. App. Nov. 7, 1986) (reversing denial of request for attorneys' fees by attorney who abandoned representation of client to become a law professor).

96.     Beckwith's claim that Hammervold was not entitled to a quantum meruit fee because of "malpractice" is also clearly wrong. By that time, the Tennessee Court of Appeals had conclusively determined that Manookian and Hammervold timely filed Beckwith's complaint, so there was no basis for alleging malpractice. *Beckwith*, 2019 Tenn. App. LEXIS 138, *14-15 ("Mr. Beckwith's confidentiality claim was timely filed on January 26, 2016."). Furthermore, Beckwith is judicially estopped from arguing that his claim was not timely filed because he previously argued, and prevailed, on a contradictory position. Hammervold had to expend significant time representing Beckwith in an appeal – not due to any legal malpractice by Manookian or Hammervold – but because Judge Binkley erred in dismissing Beckwith's accounting malpractice claim as untimely. Hammervold deserves to be compensated for that time – and that victory – on Beckwith's behalf because it is not his fault that Judge Binkley erred.

97.     On May 7, 2019, Koju again instructed Hammervold: "While we notified you yesterday that Mr. Beckwith terminated your representation of him, I want to be clear that his decision to terminate your services is not part of an offer to compromise/Rule 408. Therefore, I

---

[19] Additionally, there was no provision in the Engagement Agreement that provided for the automatic termination of the Engagement Agreement if Manookian were temporarily suspended.

am writing this confirmation of the termination of your representation of Mr. Beckwith via separate email." Koju thereafter instructed Hammervold to prepare and file a motion to withdraw.

98.     Hammervold thereafter filed a motion to withdraw on May 24, 2019 with the Tennessee Court of Appeals, and another motion to withdraw with the Tennessee Supreme Court on July 25, 2019 (after Lattimore filed a petition for permission to appeal to the Supreme Court).

99.     On July 29, 2019, Hammervold sent notice, by certified mail, terminating the January 31, 2017 Tolling Agreement between Beckwith, Hammervold and Manookian. But, Beckwith chose not to sue Hammervold or Manookian for legal malpractice (because he did not have any non-frivolous claim for same). Instead, Beckwith allowed the statute of limitations for the legal malpractice claim he previously threatened against Manookian and/or Hammervold to expire on November 6, 2019.

100.    Beckwith greatly benefitted from Hammervold's work as his attorney from January 18, 2016 through July 25, 2019. Hammervold spent hundreds of hours over multiple years and created significant value for Beckwith through that work, including (without limitation) as follows:

    a.   Reviewing client information and documents, researching in connection with, drafting, filing, and serving Beckwith's complaint within a very short time from being retained;

    b.   Preparing responses to dispositive motions on multiple grounds and either prevailing, or preserving legally-correct arguments that would later prevail, thereby allowing Beckwith to avoid dismissal of his highly valuable claim;

    c.   Preparing a motion to alter or amend, which successfully convinced the trial court to vacate a portion of its summary judgment order, and which re-urged

22

legally-correct arguments on the statute of limitations issue that were erroneously rejected by the trial court;

d. Handling the various filings and administrative tasks necessary to initiate an appeal of Judge Binkley's erroneous summary judgment disposing of Beckwith's highly valuable accounting malpractice claim; and

e. Handling all of the appellate briefing and oral argument on behalf of Beckwith, and securing an appellate victory reversing the erroneous summary judgment disposing of Beckwith's highly valuable accounting malpractice claim.

101. In sum, Hammervold's work on behalf of Beckwith created significant value for Beckwith at multiple key junctures of the case because Hammervold performed work that was absolutely essential to Beckwith being able to timely file and continue with his highly valuable accounting malpractice claim against Lattimore. Without Hammervold's excellent lawyering on behalf of Beckwith, the Court of Appeals may have affirmed the trial court's erroneous summary judgment disposing of Beckwith's highly valuable accounting malpractice claim against Lattimore.

102. Hammervold's work was particularly valuable because Beckwith's General Counsel and in-house attorneys, who otherwise would have directed Beckwith's appellate strategy if Hammervold were not involved, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮

103. Hammervold diligently represented Beckwith for over three years and spent hundreds of hours of his professional time doing so. Both Hammervold and Beckwith expected

that Hammervold would be paid by Beckwith from a contingency fee until Beckwith terminated the representation and contingency fee agreement.

104.     In connection with his representation of Beckwith, Hammervold also paid for various expenses chargeable to Beckwith, with the reasonable expectation, based on the Engagement Agreement, that Beckwith would reimburse him for those expenses. However, Beckwith refused to reimburse those expenses.

105.     Since Beckwith disputes that he owes Hammervold any amount of money for the hundreds of hours Hammervold worked as his attorney, advancing his highly-valuable accounting malpractice claim against Lattimore, this case presents

## Count I – Quantum Meruit

106.     The previous paragraphs are incorporated by reference herein.

107.     From January 18, 2016 until at least May 6, 2019, Beckwith had an Engagement Agreement with Manookian and Hammervold, by which he was required to pay a contingency fee that would be split between Manookian and Hammervold, based on their division of labor in the case.

108.     Mark Hammervold was at least an intended third-party beneficiary of that contingency fee agreement.

109.     Under Tennessee law and by the terms of the Engagement Agreement, Beckwith had the unconditional right to terminate Manookian and Hammervold as his attorneys, and Beckwith did so on May 6, 2019.

110.     As a result of Beckwith's termination of the Engagement Agreement, Hammervold became limited in his recovery of fees to quantum meruit.

24

111. Under Tennessee law, where one or more attorneys were to be paid pursuant to a contingency fee agreement, and the attorney-client relationship is thereafter terminated, the dismissed attorneys may nonetheless recover the actual value of the services provided.[20]

112. Hammervold provided significant services to Beckwith as his attorney, based on both Parties expectation that Hammervold would be paid by Beckwith for those services. Otherwise, Hammervold would not have worked for Beckwith for hundreds of hours over multiple years for free. This was not a *pro bono* case where the plaintiff was indigent, or the claim involved some public good or social justice.

113. The claim for quantum meruit in this case – and in general – serves a vitally important purpose because it is necessary to ensure that lawyers are willing to represent clients on a contingent basis. If clients could do what Beckwith did to Hammervold, no lawyer would be willing to take on a case for a contingent fee. While wealthy clients like Beckwith could make do regardless, it would have major adverse effects on clients with less means who have suffer redressable injuries.

114. Beckwith significantly benefitted from Hammervold's services because (1) due to Hammervold's efforts, Beckwith's highly valuable accounting malpractice claim against Lattimore was timely-filed and able to proceed past dispositive motions into discovery; and (2) without Hammervold's significant efforts on his behalf, Beckwith would not have been able to file his valuable accounting malpractice claim against Lattimore, or the erroneous summary judgment of that claim would have been affirmed by the Court of Appeals, totally extinguishing the value of a multimillion dollar claim.

---

[20] The same remains true even if the attorney(s) chose to withdraw from the representation. *See Miltier*, 2013 Tenn. App. LEXIS 419, *14-15; *Madison Tire Co.*, 1986 Tenn. App. LEXIS 3427, *3, 7-8.

115.     In addition to ensuring that Beckwith's highly valuable claim progressed past these material, macro-level stages of the litigation, Hammervold also provided Beckwith with many other valuable services throughout the case, for which clients routinely pay a premium price, including, for example: providing regular, detailed updates about the case and providing insight and strategy about how the case should be pursued going forward.

116.     Hammervold spent hundreds of hours in connection representing Beckwith.

117.     The value of the services that Hammervold provided to Beckwith easily exceeded the $75,000 amount-in-controversy threshold required for diversity jurisdiction.

### Count II – Unjust Enrichment

118.     The previous paragraphs are incorporated by reference herein.

119.     Hammervold conferred a benefit upon Beckwith by representing him with respect to his highly valuable accounting malpractice claim against Lattimore for over three years, and helping him file that claim and obtain reversal of Judge Binkley's erroneous summary judgment of that claim.

120.     Beckwith greatly benefitted from Hammervold representing him for over three years with respect to highly valuable accounting malpractice claim against Lattimore.

121.     Under the circumstances, it would be inequitable and unjust for Beckwith to retain the benefit of Hammervold's hundreds of hours of highly skilled labor over multiple years, without paying for the value of those services.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, Mark Hammervold, requests that this Court enter judgment in his favor and against Defendant Larry Beckwith, as follows:

(A) Award Hammervold damages, in excess of $250,000, for the actual value of the services he provided Beckwith as his attorney in an amount to be determined based on the proof presented, and for the reimbursement of expenses Hammervold personally paid on behalf of Beckwith, but for which Beckwith refused to reimburse Hammervold;

(B) Award Hammervold pre-judgment interest pursuant to Tenn. Code Ann. § 47-14-123;

(C) Declare that Hammervold is entitled to recover a reasonable fee from Beckwith for the hundreds of hours he spent working on Beckwith's behalf in *Beckwith v. Lattimore,* based on the value of those services provided to Beckwith;

(D) Award Hammervold the costs incurred in bringing this action; and

(E) Any further relief this Court deems just.


**RESPECTFULLY SUBMITTED,**

**s/Mark Hammervold**[21]
Mark Hammervold, TN #31147
155 S. Lawndale Ave.
Elmhurst, IL 60126
(T) 405.509.0372
(F) 615.928.2264
mark@hammervoldlaw.com

---

[21] Mark Hammervold is admitted to practice in this district, but is representing himself *pro se* in this case.

27