# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **MARK HAMMERVOLD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:22-cv-01053** |
| | ) | **Judge Aleta A. Trauger** |
| **LARRY BECKWITH,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Before the court is defendant Larry Beckwith's Motion for Summary Judgment (Doc. No. 71), seeking judgment in his favor on plaintiff Mark Hammervold's *quantum meruit* claim against him to recover compensation for the value of legal services he provided to Beckwith from 2016 through 2019. Hammervold opposes the motion (Doc. No. 66), and he also filed a Motion to Limit the Testimony of Defendant's Retained Expert Witness Kevin Balz (Doc. No. 57). Beckwith opposes that motion. (Doc. No. 74.)

For the reasons set forth herein, the Motion for Summary Judgment (Doc. No. 71) will be denied. Further, because Kevin Balz's testimony is irrelevant to the Motion for Summary Judgment, the court has not relied on it and finds it unnecessary to rule on the Motion to Limit Testimony at this time. That motion, therefore, will be denied without prejudice to the plaintiff's ability to file a pretrial motion in limine to limit Balz's testimony. The court nonetheless observes that such a motion would be of limited utility in light of the fact that trial of this matter will be before the court rather than a jury, and the court is unlikely to allow expert testimony on a legal matter to color its view of the facts.

## I.  LEGAL STANDARDS

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, inter alia, "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials"—that it believes demonstrate the absence of a genuine dispute over material facts. Fed. R. Civ. P. 56(c)(1)(A); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018). The material on which a party relies in support of a summary judgment motion does not need to be in a form admissible in evidence; rather, once an objection is "properly made" under Rule 56(c)(2), "the proponent must 'show that the material is admissible as presented or . . . explain the admissible form that is anticipated.'" *Mangum v. Repp*, 674 F. App'x 531, 536–37 (6th Cir.

2017) (quoting Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## II.    FACTS[1]

On January 18, 2016, Larry Beckwith entered into an engagement agreement ("Engagement Agreement") with the law firm of Cummings Manookian PLC. (Engagement Agreement, Doc. No. 53-1.)[2] Plaintiff Mark Hammervold is not, and has never been, a member of, or formally employed as an associate of, Cummings Manookian PLC.

The Engagement Agreement provides in relevant part as follows:

> Our client will be you [Beckwith] in your individual capacity and LBDB Holdings, LLC f/k/a Eco Energy Holdings, Inc. ["LBDB Holdings"]. We will represent you in the matter involving LBMC f/k/a Lattimore Black Morgan & Cain's breach of duties and contract . . . .
>
> All work on this matter will be done by Brian Manookian or Mark Hammervold. . . .
>
> Our fees for work on this case will be on a contingency basis. . . . If you do not receive a settlement, judgment, or award we do not receive a fee. The contingency fee rate is the scale we previously agreed upon, I ask that you handwrite it in the space below, and I'll initial as well.
>
> [Handwritten contingency fee scale.]

---

[1] The facts set forth herein for which no citation is provided are drawn from the plaintiff's Response to the defendant's Statement of Undisputed Material Facts ("Response to SUMF") (Doc. No. 64) and are undisputed for purposes of the Motion for Summary Judgment. Unless otherwise indicated, the facts are viewed in the light most favorable to the plaintiff as the non-moving party.

[2] The Engagement Agreement is in the record in several places. This version includes the contingency percentages the parties agreed upon.

Additionally, I occasionally split my portion of contingency fees with Mark Hammervold when I have him assist in a case. I may have him assist in this case, and if so, you agree to my sharing of my fee with him. All compensation to Mr. Hammervold is out of my already agreed upon fee and does not cost you anything additional.

. . . .

You have the right to change attorneys to another attorney or firm at any time by sending us a letter to that effect. . . . If you terminate the representation before the conclusion of the matter, we will additionally be entitled to receive from the proceeds of any recovery a reasonable fee for the work we have performed, based upon the amount of time required, the complexity of the matter, the time frame within which the work was performed, our experience, ability, reputation, the responsibility involved and the results obtained.

We may choose to withdraw from representing you and request, in writing, that you obtain another attorney or firm to represent you. . . .

(*Id.* at 1–3.)

According to Brian Manookian, even before the parties executed the Engagement Agreement, he and Beckwith discussed the fact that Manookian would have Mark Hammervold work with him on the case. (Doc. No. 60, Manookian Decl. ¶ 2.) The Engagement Agreement also notified Beckwith that Hammervold would be working on his case. Hammervold actually began reviewing documents and performing work on the case on January 16, 2016. (Doc. No. 62, Hammervold Sealed Decl. ¶ 12.) Following execution of the Engagement Agreement, Manookian emailed Hammervold at 9:00 a.m. on January 21, 2016, confirming that he needed his assistance in drafting a complaint in the lawsuit ("underlying lawsuit") that Beckwith and his company, LBDB Holdings, were pursuing against LBMC f/k/a Lattimore Black Morgan & Cain ("Lattimore"). (Doc. No. 53-2.) On January 22, 2016, Manookian and Hammervold faxed the Complaint initiating the underlying lawsuit to the Circuit Court for Williamson County,

Tennessee.[3] An original signed copy of the Complaint was filed, and the filing fee submitted, on January 26, 2016.

What ensued thereafter was three years of litigating the question of whether the claims set forth in the state court Complaint were barred by the applicable statutes of limitation. Initially, the defendant filed a summary judgment motion seeking dismissal of the claims brought by LBDB Holdings and by Beckwith individually as time-barred.[4] Mark Hammervold and Brian Manookian responded in opposition on behalf of Beckwith, but the trial court granted the motion, finding that a Tolling Agreement executed by Beckwith and Lattimore imposed a contractual filing deadline of January 22, 2016 and that the Complaint had not technically been filed until January 26, 2016, the day the original, signed Complaint and filing fee were submitted.

Following entry of summary judgment for Lattimore, Hammervold worked essentially single-handedly in pursuing reversal of that decision, first by filing a motion to alter or amend judgment in the trial court and then, when that motion was denied, by pursuing an appeal to the Tennessee Court of Appeals. Throughout this time, and up until the appellate court issued its ruling, Hammervold took primary responsibility for communications with Beckwith, LBDB Holdings' in-house counsel, and opposing counsel. He attended hearings and served as lead counsel on the appeal. (Doc. No. 60, Manookian Decl. ¶ 7.)

---

[3] Due to a snowstorm on January 22, 2016, the Williamson County courts closed before noon that day. (Doc. No. 67-1, Williams Dep. 5–6.) Manookian obtained special permission from the Clerk of Court to file the Complaint by fax, as he apparently was under the impression that the limitations period expired that day. (Doc. No. 60, Manookian Decl. ¶ 5.) Hammervold, who lived in Chicago, fax-filed the Complaint at 9:34 a.m., and the Clerk's Office time-stamped the Complaint as filed at 9:34 a.m. on that day. (*Id.*) The Clerk assured Manookian that the Complaint was filed as of that time. (*Id.*)

[4] As Hammervold points out, the defendant in the underlying lawsuit raised other defenses as well, which Hammervold and Manookian were called upon to rebut, but they are not relevant for purposes of the Motion for Summary Judgment.

On August 19, 2017, while the appeal was still pending, Brian Manookian told Beckwith, in a contentious email regarding the appeal, "Let's talk next week about my role going forward. I intend to pursue the appeal in this matter, but I will withdraw at its conclusion, as is my prerogative under our engagement letter. You need to arrange for Bill or Harold or someone else to take my place." (Doc. No. 5, Sealed Compl. ¶ 46.) Nothing in the record, however, reflects that Manookian or Hammervold formally withdrew from representing Beckwith following this email.

On or about September 21, 2018, Manookian was suspended from the practice of law and ceased any work on the case, but Mark Hammervold continued working on the appeal of the trial court's decision in the underlying lawsuit. After oral argument, Beckwith regularly contacted Hammervold for updates, and Hammervold responded each time to assure Beckwith that he would notify him as soon as the Court of Appeals reached a decision. (Doc. No. 62, Hammervold Sealed Decl. ¶ 53.)

On March 21, 2019, the Tennessee Court of Appeals entered an opinion vacating the state court order granting summary judgment to Lattimore on Beckwith's individual breach of confidentiality claim. *Beckwith v. LBMC, P.C.*, No. M2017-00972-COA-R3-CV, 2019 WL 1306201, at *5 (Tenn. Ct. App. Mar. 21, 2019). Adopting an argument set forth in the briefing filed by Hammervold, the Court of Appeals found that the Tolling Agreement did not set a deadline of January 22, 2016 for filing but, instead, simply tolled the running of the statute of limitations for Beckwith's individual claim against Lattimore until that date. As a result, the appellate court determined that, irrespective of whether the Complaint was technically filed on January 22 or January 26, it was timely. *See id.* ("The running of the statute of limitations stopped during the tolling period and recommenced at 4:30 p.m. on January 22, 2016, leaving Mr. Beckwith approximately sixty days after January 22 to file his claim.").

Hammervold notified Beckwith of the opinion the same day, by email, and the two had a follow-up telephone call the next day. (Doc. No. 62, Hammervold Sealed Decl. ¶ 56.) According to Hammervold, it was clear from the tenor of the conversation that Beckwith at that time considered the attorney-client relationship to be ongoing, and Beckwith expressed "happiness and satisfaction" with the result of the success of the appeal. (*Id.*) Hammervold "discussed the next steps with Beckwith and agreed to keep [him] apprised of further developments." (*Id.*)

On March 29, 2019, Hammervold began working on a motion to disqualify the trial judge whose opinion had been vacated on appeal, to be filed once the case was remanded. (*Id.* ¶ 57.)

On April 11, 2019, attorney Stacey Koju emailed Hammervold, indicating that she represented Beckwith "on some of his general legal matters" and that Beckwith had "asked [her] to reach out to [Hammervold]." (*Id.* ¶ 58.) Hammervold spoke with Koju on the phone on April 12, 2019, at which time she informed him that Beckwith was "weighing his options regarding whether to have [Hammervold] continue representing Beckwith going forward." (*Id.*)

On April 17, 2019, Hammervold emailed Koju and Beckwith to ask whether Beckwith had "decided what [he] want[ed] to do going forward with the litigation." (*Id.* ¶ 59.) Koju responded the next day by asking to schedule a call. (*Id.*) During that April 18, 2019 call, Koju informed Hammervold that Beckwith was "leaning towards terminating the Engagement Agreement." (*Id.* ¶ 60.) The plaintiff's Complaint alleges that, during that call, Koju indicated that Beckwith was concerned about owing fees in *quantum meruit* to Manookian and Hammervold based on the work they had done on his case through that date. (Doc. No. 5, Sealed Compl. ¶ 87.) Hammervold alleges that Koju "floated the possibility" of Beckwith's "buying off" such a claim for a "lowball amount" and suggested that, because Hammervold and Manookian had committed "malpractice," they were not entitled to a fee. (*Id.*)

On April 18, 2019, Hammervold discussed these events with Manookian, and Manookian agreed that he would assign the entirety of any contingency fee received on the case, "including any *quantum meruit* claim," to Hammervold. (Manookian Decl. ¶ 8.)

On April 26, 2019, having not heard back from Koju or Beckwith, Hammervold emailed Koju:

> I have not heard back from you. Can you please respond by letting me know what [Beckwith] wants to do, including whether he is terminating me from representing him. I need to know the latter ASAP.

(Hammervold Sealed Decl. ¶ 62.) After repeated requests from Hammervold for a decision, Koju finally notified him on May 6, 2019 that "Mr. Beckwith would not like to proceed with your representation of him in the LBMC Litigation." (*Id.* ¶ 64.) On May 7, 2019, Koju wrote again to reiterate Beckwith's decision and to make it "clear that his decision to terminate [Hammervold's] services is not part of an offer to compromise/Rule 408." (*Id.* ¶ 65.)

Koju thereafter instructed Hammervold to prepare and file the necessary motions to withdraw, which he did. (*Id.* ¶¶ 65, 66.)

Because Hammervold represented Beckwith based on a contingency fee arrangement, he did not keep track of his hours. (*Id.* ¶ 70.) However, he estimates that he "would have spent several hundred hours representing Beckwith . . . from January 16, 2016 to July 25, 2019." (*Id.*)

Beckwith contends that he did not "consent to a transfer of the rights" under the Engagement Agreement from Manookian to Hammervold. (Doc. No. 53-4, Beckwith Decl. ¶ 9.) Manookian has never sought payment from Beckwith on his own behalf.

Beckwith's litigation against Lattimore in Tennessee state court remained ongoing as of July 2024. (Hammervold Sealed Decl. ¶ 72.) He seeks millions of dollars in damages against Lattimore for breach of fiduciary duty in the underlying lawsuit. (*Id.* ¶ 68.) Beckwith denies that Hammervold "will be entitled to any portion of an eventual recovery against Lattimore." (*Id.* ¶ 73.)

In response to an interrogatory asking him to specify the damages sustained in this case, Hammervold answered:

> Plaintiff is entitled to recover a fair and reasonable fee for the value his work created and preserved for Larry Beckwith. However, a computation of damages is premature as said computation would rely, at least in part, on information yet to be obtained through discovery. As already briefed by the Parties, the value of Plaintiff's *quantum meruit* claim depends, in part, on the value of Beckwith's accounting malpractice claim against Lattimore.

(Doc. No. 53-6, at 3.)

The plaintiff initiated this lawsuit in December 2022. After the court denied Beckwith's Motion to Dismiss, the parties conducted discovery, and Beckwith filed his Motion for Summary Judgment. (Doc. No. 50.) The motion is supported by a Memorandum of Law, Statement of Undisputed Material Facts, and various exhibits, both sealed and unsealed. (Doc. Nos. 51, 52, 53 (and attachments), 55 (and attachments). The plaintiff has filed sealed and unsealed versions of his Response in opposition to the motion, a Response to the Statement of Undisputed Material Facts and a separate Statement of Additional Disputed Material Facts, and his own evidentiary material, including the Declaration of Brian Manookian and sealed and unsealed versions of his own Declaration. (Doc. Nos. 60, 62–67.) Beckwith filed a Reply and a Response to the plaintiff's Statement of Additional Material Facts. (Doc. Nos. 75–76.)

## III. DISCUSSION

Beckwith argues that he is entitled to summary judgment on Hammervold's *quantum meruit* claim because: (1) Hammervold cannot show that he provided valuable goods and services; (2) Hammervold cannot show that it would be unjust for Beckwith to retain his services without paying for them; (3) Hammervold cannot show that Beckwith should have reasonably understood that Hammervold expected to be compensated; (4) Hammervold has failed to present any evidence that would support the reasonableness of a fee of $250,000, as claimed in the Complaint; (5)

Hammervold's unethical conduct and "clear violation" of Rule 1.5 of the Tennessee Rules of Professional Conduct ("Rule 1.5") should bar recovery of his fees entirely. (Doc. No. 51, at 2.)

Hammervold argues in response that there is evidence in the record to support each of the required elements of a *quantum meruit* claim; Beckwith's attempt to raise a legal malpractice affirmative defense is improper and meritless; the court has no need to determine the amount of Hammervold's damages at the summary judgment stage, and Beckwith's focus on the *ad damnum* reflected in the Complaint is misplaced and meritless; and the assertion that Hammervold has violated Rule 1.5 or otherwise engaged in unethical conduct is likewise without merit. (Doc. No. 65.) In his Reply (Doc. No. 76), Beckwith contends that Hammervold's Response does not address his substantive arguments based on the required elements of a *quantum meruit* claim and that Hammervold has mischaracterized his arguments.

### A.      Proof of the Substantive Elements of a *Quantum Meruit* Claim

As this court already stated in ruling on the defendant's Motion to Dismiss, the Tennessee Supreme Court defines *quantum meruit* as

> an equitable substitute for a contract claim pursuant to which a party may recover the reasonable value of goods and services provided to another if the following circumstances are shown:
>
> 1. There is no existing, enforceable contract between the parties covering the same subject matter;
>
> 2. The party seeking recovery proves that it provided valuable goods or services;
>
> 3. The party to be charged received the goods or services;
>
> 4. The circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services expected to be compensated; and
>
> 5. The circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment.

*Swafford v. Harris*, 967 S.W.2d 319, 324 (Tenn. 1998) (citing *Castelli v. Lien*, 910 S.W.2d 420,

427 (Tenn. Ct. App. 1995)). "Liability under *quantum meruit* is based on a legally implied promise to pay a reasonable amount for goods or services received." *Castelli*, 910 S.W.2d at 427.

Courts have permitted attorneys to recover under the doctrine of *quantum meruit* where, for example, an existing contingency fee agreement is rendered unenforceable as a whole as the result of its inclusion of an impermissible term, *see, e.g.*, *Cummings v. Patterson*, 442 S.W.2d 640 (Tenn. Ct. App. 1968), or omission of a necessary term, *see, e.g.*, *Seiden L. Grp., P.C. v. Segal*, 202 N.E.3d 343 (Ill. Ct. App. 2021), *appeal denied*, 187 N.E.3d 712 (Ill. 2022). In addition, courts permit attorneys to recover a reasonable fee under a *quantum meruit* theory when a contingency fee agreement is terminated prior to resolution of the proceeding to which it pertains. *See, e.g.*, *Mitch Grissim & Assocs. v. Blue Cross & Blue Shield of Tenn.*, 114 S.W.3d 531, 537 (Tenn. Ct. App. 2002).

Beckwith argues that Hammervold cannot establish the second, fourth, and fifth of these elements.

### 1. Did Hammervold Provide Valuable Goods and Services

Beckwith contends that Hammervold

> cannot recover for any work following the Court's order dismissing the complaint in the Underlying Case due to the statute of limitations because Beckwith did not benefit from those services. It was Hammervold's failure to timely file the complaint in the Underlying Case based on his understanding of the statute of limitations at that time that necessitated his additional work. . . .
>
> . . . . Following the appeal of the state court's decision dismissing the complaint as untimely, Beckwith was left with exactly what he bargained for at the time he initially contracted with Manookian, which was the ability to pursue his claims against LBMC. Therefore, Hammervold cannot show that Beckwith received any benefit for the services that he received following the state court's dismissal of the initial complaint that was filed in the Underlying Case.

(Doc. No. 51, at 12–13.)

The court is not persuaded by this argument. The Tennessee Court of Appeals rejected defense counsel's untimeliness argument and found that the trial court—not Beckwith's attorneys—erred in finding that the Complaint in the underlying lawsuit was untimely. The day after the trial court issued its ruling granting summary judgment to the defendant on Beckwith's claim, he did not have a valid claim to pursue. After the appeals court vacated that decision, due to Hammervold's work, Beckwith's multi-million-dollar claim against Lattimore was reinstated. While it is certainly true that, three years into the litigation, Beckwith was left in essentially the same place he started, and also true that a "complete" filing of the signed Complaint and filing fee on January 22 or January 25, 2016[5] would have obviated the ostensible basis for the defendant's statute of limitations argument, that does not mean that Hammervold can be faulted for the defendant's or the trial court's erroneous position. A reasonable finder of fact, in short, could find that Hammervold's work on the appeal provided a valuable service to Beckwith, insofar as it restored to him the ability to pursue his claim.

Beckwith states that element five—that the "circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment"—is intertwined with the second element and that the two should be analyzed together, but he does not actually address the fifth element. The court likewise finds that there is at least a question of fact as to whether it would be unjust for Beckwith to retain the value of Hammervold's efforts to restore to Beckwith a valuable legal claim without payment for that service.

---

[5] The Williamson County Circuit Court reopened following the snowstorm on Monday, January 25, 2016, but Hammervold did not file the signed Complaint and pay the filing fee until Tuesday, January 26, 2016.

> ## 2. Whether the Circumstances Indicate that both Beckwith and Hammervold Understood that Hammervold Expected to Be Compensated

Beckwith asserts that the undisputed material facts establish that he "never understood that Hammervold expected to be compensated directly by Beckwith for any services and that this understanding was reasonable." (Doc. No. 51, at 9.) The undisputed facts to which he points are: (1) that the Engagement Agreement itself indicates that Manookian would compensate Hammervold by dividing with him whatever contingency fee his firm received and that this would "not cost [Beckwith] anything additional" (Doc. No. 53-1, at 2); (2) if Manookian withdrew from the representation, "which he did based on the undisputed facts," Beckwith would only be responsible for accrued costs (Doc. No. 51, at 10); and (3) "[e]ven the Complaint admits that 'the split of the contingent attorney fee *would be determined later* among the attorneys and approved by the client,'" but "this never took place" (*id.* (quoting Complaint ¶ 11) (emphasis added by Beckwith));[6] and (4) "Beckwith was never provided any information about compensating Hammervold separately" and did not enter into an engagement agreement directly with Hammervold or discuss with Hammervold the terms of Hammervold's representation, the rates he would charge, or the percentage of any judgment or settlement he would receive. Based on these "facts," Beckwith maintains that he "was not aware that Hammervold expected to be compensated for his services separately from whatever arrangement Manookian and Hammervold had amongst themselves." (*Id.*)

---

[6] This allegation in the Complaint actually describes the usual terms of Hammervold's arrangement with Manookian when they worked together on a case; it does not describe the terms of the Engagement Agreement Beckwith signed. (*See* Complaint ¶ 11.) The Engagement Agreement actually provides that, if Hammervold "assist[s] in this case," Beckwith agreed to Manookian's sharing his fee with Hammervold. (Doc. No. 53-1, at 2.)

Beckwith's position is patently unreasonable. It is also undisputed that: (1) the Engagement Agreement specifically informed Beckwith that Manookian and Hammervold would be the attorneys performing work on his case, and the Engagement Agreement uses the pronoun "we" throughout to refer to both attorneys (*see generally* Doc. No. 53-1); (2) when Manookian was suspended from the practice of law in September 21, 2018, as a result of which he presumably withdrew from representation of any clients in any lawsuits in which he was involved at the time, Hammervold did not withdraw—and was not asked to withdraw—from representing Beckwith; (3) Beckwith, despite apparently knowing that he was not represented by Manookian, continued to treat Hammervold as his attorney and to accept Hammervold's services; (4) Beckwith did not formally terminate his relationship with Hammervold and direct him to withdraw as his attorney of record until May 2019; (5) prior to that directive, Beckwith had not acted as though he believed the Engagement Agreement had terminated with Manookian's withdrawal; (6) the Engagement Agreement provides that, if Beckwith unilaterally terminates the representation, Manookian and Hammervold ("we") would "be entitled to receive from the proceeds of any recovery a reasonable fee for the work we have performed, based upon the amount of time required, the complexity of the matter, the time frame within which the work was performed, our experience, ability, reputation, the responsibility involved and the results obtained." (Doc. No. 53, at 3.)

Based on these circumstances, including the undisputed existence of the Engagement Agreement and Beckwith's documented understanding that Hammervold was functioning as one of his attorneys, it is clear (as the court already found in the context of ruling on the Motion to Dismiss) that there is at least a question of fact as to whether Beckwith knew, or reasonably should have known, that Hammervold expected to be compensated for his services if Beckwith terminated his representation prior to a final resolution of the underlying lawsuit.

## B.     "Unethical Conduct"

Beckwith argues that, even assuming that Hammervold can present proof as to all of the elements of a *quantum meruit* claim, he should be barred from recovering fees "due to his unethical conduct." (Doc. No. 51, at 15.) He claims that (1) Hammervold's work on the case following the filing of the Complaint was "necessitated by Hammervold and Manookian's own malpractice" and (2) Hammervold's actions in this case violate Rule 1.5 of the Tennessee Rules of Professional Conduct ("Rule 1.5").

### 1.     *Malpractice*

Beckwith's brief contains no argument supporting his malpractice allegations. In his Reply, and despite the language quoted above from his opening Memorandum, he disclaims any intention of relying on allegations that Hammervold committed malpractice, as he states that Hammervold "incorrectly asserts that Beckwith is arguing that Hammervold committed 'malpractice,' and relies on the unsupported contention that Beckwith should be precluded from asserting his arguments." (Doc. No. 76, at 2.) In other words, Beckwith has clearly waived his claim that Hammervold is barred from recovering a *quantum meruit* fee based on having committed malpractice.

Moreover, as indicated above, the Tennessee Court of Appeals conclusively determined that the Complaint in the underlying action was timely as to Beckwith's claim against Lattimore, and Beckwith has not explained why Hammervold should be faulted for the defendant's and the trial court's erroneous conclusions to the contrary.

### 2.     *Rule 1.5 of the Rules of Professional Conduct*

Rule 1.5(a) provides that lawyers shall not "make an agreement for, charge, or collect an unreasonable fee" and sets forth a non-exhaustive list of factors to be considered in determining the reasonableness of a fee. Tenn. S. Ct. R. 8, R. Prof'l Conduct 1.5(a). The rule further states:

(b) The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation, except when the lawyer will charge a regularly represented client on the same basis or rate. Any changes in the basis or rate of the fee or expenses shall also be communicated to the client.

(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. A contingent fee agreement shall be in a writing signed by the client and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial, or appeal; litigation and other expenses to be deducted from the recovery; and whether such expenses are to be deducted before or after the contingent fee is calculated. The agreement must clearly notify the client of any expenses for which the client will be liable whether or not the client is the prevailing party. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination.

*Id.*, Rule 1.5(b) & (c).

Beckwith argues that Hammervold "clearly" violated this rule when he and Manookian "unilaterally" agreed that Manookian would assign the entirety of his portion of the contingency fee to Hammervold, because the Engagement Agreement does not "state the percentage of the fee that would accrue to Mr. Manookian" [sic] and because Beckwith did not consent to that division (Doc. No. 51, at 16, 11.)

This purported failure does not implicate Rule 1.5. The Engagement Agreement unambiguously informed Beckwith that Hammervold would be assisting Manookian on the case. In addition, the record clearly establishes both that Beckwith approved Manookian's decision to engage Hammervold to assist him and that Beckwith knew about—and never objected to—Hammervold's representation of him in the underlying lawsuit. As for the division of fees between

Hammervold and Manookian, the Engagement Agreement provides for a net contingency fee[7] to be paid to the lawyers, collectively, who would divide it among themselves as they saw fit. Beckwith explicitly agreed to that arrangement. (*See* Doc. No. 53-1, at 2 ("I may have [Hammervold] assist in this case, and if so, you agree to my sharing of my fee with him.").) As long as the total amount of the fee remained unaffected by that arrangement, there was no need for Beckwith to consent to the percentage of the fee received by each lawyer. Manookian having expressly disclaimed any share in the fee, Hammervold clearly has standing to pursue a fee in *quantum meruit*.

Beckwith also maintains that, to the extent Hammervold "attempts to rely on a contingency fee arrangement between Hammervold and Beckwith, separate from the Manookian Engagement Agreement," any such purported agreement would violate Rule 1.5, because Beckwith and Hammervold never discussed or agreed to any such contingency fee arrangement. (Doc. No. 51, at 16.) But Hammervold does not contend that there is any such separate agreement, so this argument is misplaced. In fact, if a contract existed between Hammervold and Beckwith, Hammervold would likely have brought a claim for breach of contract rather than *quantum meruit*.

Beckwith also asserts that, to the extent Hammervold relies on *Miltier v. Bank of America, N.A.*, No. E2012-00393-COA-R3-CV, 2013 WL 3282939 (Tenn. Ct. App. June 26, 2013), and *Madison Tire Co. v. Weaver*, No. 7, 1986 WL 12493 (Tenn. Ct. App. Nov. 7, 1986), to support his *quantum meruit* claim, those cases are distinguishable, because the attorneys in those cases were parties to the initial contingency fee agreements when the defendants terminated the attorney-client relationship. In both cases, however, it was the *attorney* who terminated the relationship, not the

---

[7] The Engagement Agreement provided for a fee based on different percentages of the first $150,000, each additional $50,000 above that up to $450,000, and any amount over $450,000.

defendant, but the courts determined that they were nonetheless entitled to *quantum meruit* fees. *See Miltier*, 2013 WL 3282939, at *5 ("Having withdrawn from his representation of Client, Mr. Cowan was limited in his recovery of fees pursuant to *quantum meruit*."); *Madison Tire*, 1986 WL 12493, at *3 (Tenn. Ct. App. Nov. 7, 1986) (where the attorney's "abandonment" did not cause the client damage or injury, remanding "to the trial court for proof as to the amount of time spent and the reasonable value of services rendered" by the attorney, and noting that the attorney had the burden of proof of showing "what services were rendered and what compensation is reasonable").

These cases, however, do stand for the principle that "[f]orfeitures are not favored" under Tennessee law, *Madison Tire*, 1986 WL 12493, at *3, and that equitable remedies are available to attorneys who perform work for a client and reasonably expect compensation for that work. They do not alter the elements of ordinary *quantum meruit* claims or establish that an attorney must have personally signed the engagement agreement to be able to recover in *quantum meruit* the value of his services that are expressly covered by that agreement.

### C.    The Amount of Damages Sought

The Tennessee Supreme Court has held that an attorney who "enters into a fee contract, or attempts to collect a fee," that is clearly excessive in violation of the applicable ethics rules generally may not recover under *quantum meruit*. *White v. McBride*, 937 S.W.2d 796, 803 (Tenn. 1996). Beckwith has not argued that the contingency figures set forth in the Engagement Agreement are excessive *per se*, but he does argue that "Hammervold's request for over $250,000 of fees is unreasonable." (Doc. No. 51, at 13.) He asserts that Hammervold has "set forth no evidence to support [his] contention" that the $250,000 claimed in the Complaint approximates the "actual value of the services he provided," under the factors relevant to the determination of a

reasonable fee. (*Id.*)[8]

In support of this argument, Beckwith points to Hammervold's answers to interrogatories asking him to "[d]escribe with specificity" the damages he sustained and to "describe the work performed and an estimate of the number of hours of work performed." (Doc. No. 51, at 13–14.) Hammervold's interrogatory answers state that (1) a computation of his damages is premature, because the value of his services depends, in part, on the value of Beckwith's claim against Lattimore in the underlying lawsuit; (2) because he knew he was working under a contingency fee arrangement, he did not keep contemporaneous records of his hours and could not recreate time entries now; and (3) his *quantum meruit* claim is based primarily on the "value created and/or preserved by the representation" rather than the number of hours worked. (*Id.*)[9]

In his Response to the Motion for Summary Judgment, Hammervold argues that it is premature to determine the amount of his damages at this stage and that the *ad damnum* sought in a complaint is generally irrelevant and inadmissible at trial under Tennessee law. (Doc. No. 65, at 2.) The cases he cites, indeed, stand for the proposition that "a plaintiff may argue the worth or monetary value of [her claims] to the jury, but she may not disclose the specific sum sought in the

---

[8] The defendant cites the factors listed in *Gerber v. Segal*, No. W2001-01709-COA-R3-CV, 2003 WL 327519, at *5 (Tenn. Ct. App. Feb. 11, 2003), which was issued prior to the Tennessee Supreme Court's adoption of the Rules of Professional Conduct in 2011. More recent cases follow the guidance provided by Rule 1.5. *See Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 185–86 (Tenn. 2011); *Smith v. All Nations Church of God*, No. W2019-02184-COA-R3-CV, 2020 WL 6940703, at *5 (Tenn. Ct. App. Nov. 25, 2020).

[9] Beckwith also relies on the testimony of his proposed expert, Kevin Balz, who opines in part that Hammervold would only be entitled to recover a reasonable hourly fee for the work performed through the preparation and filing of the Complaint in the underlying lawsuit. The court has already determined that there is at least a factual dispute as to whether Hammervold's work on the appeal provided a service of value to Beckwith and declines, for purposes of the Motion for Summary Judgment, to consider Balz's opinion to the contrary, which simply establishes the existence of a factual dispute. The court reserves ruling on the ultimate admissibility at trial of Balz's opinion in that regard.

complaint." *Guthrie v. Ball*, No. 1:11-cv-333-SKL, 2014 WL 11581408, at *1 (E.D. Tenn. Oct. 10, 2014) (citing *Elliott v. Cobb*, 320 S.W.3d 246, 251 (Tenn. 2010); *Donathan v. Orthopaedic & Sports Med. Clinic, PLLC*, No. 4:07-cv-18, 2009 WL 3584263, at *2 (E.D. Tenn. Oct. 26, 2009)). But this principal has little bearing on the question of whether the attorney fees sought by Hammervold are reasonable *per se*. Hammervold also asserts that the amount of the fee he intends to seek will be based on a reasonable percentage of the original contingency fee scale set forth in the Engagement Agreement and that the value of his services in this context depends on more than just the number of hours worked. (Doc. No. 65, at 16.)

The court observes that the amount sought in the Complaint is undoubtedly substantial. Hammervold will have the ultimate burden of proving the amount of damages he is entitled to recover. The assessment of damages will be informed by the factors identified by the Tennessee Supreme Court in Rule 1.5, including

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) whether the fee is fixed or contingent;

(9) prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and

(10) whether the fee agreement is in writing.

Tenn. S. Ct. R. 8, RPC 1.5(a). In addition, however, as set forth above, the Engagement Agreement itself identifies factors to be considered and states that, unless Beckwith recovers in the underlying lawsuit, neither Manookian nor Hammervold will be entitled to recover any fee:

> If you do not receive a settlement, judgment, or award we do not receive a fee. . . .
>
> If you terminate the representation before the conclusion of the matter, we will additionally be entitled to receive from the proceeds of any recovery a reasonable fee for the work we have performed, based upon the amount of time required, the complexity of the matter, the time frame within which the work was performed, our experience, ability, reputation, the responsibility involved and the results obtained.

(Doc. No. 53-1, at 2, 3.) Based on all of these factors, including that the amount of the fee should be based at least in part on the amount of Beckwith's ultimate recovery, if any, the court cannot conclude that the amount Hammervold seeks is outside the bounds of reasonableness. Beckwith has not established that the amount of the fees sought is so "clearly excessive" based on these factors that it implicates the rule announced in *White v. McBride*.

Moreover, insofar as Beckwith relies on the opinion testimony of Kevin Balz to establish that Hammervold's fee request is unreasonable, the court, again, finds that Balz's opinion, at most, establishes a factual dispute as to the amount of damages Hammervold can recover. And, as Hammervold correctly points out, while the *existence* of damages may properly be raised at summary judgment, the *amount* of damages is a matter for the trier of fact. Here, Hammervold has presented proof that he has incurred damages. Contrary to Beckwith's suggestion, Hammervold is not required to prove damages through expert testimony. *Accord Zitzow v. Auto-Owners Ins. Co.*, No. 22-5549, 2023 WL 2033792, at *7 (6th Cir. Feb. 16, 2023) (no expert needed to prove damages in breach of contract case); *see also Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 198 (Tenn. 2001) ("Courts will not award *quantum meruit* recoveries without some proof of the reasonable value of the goods or services, but the required proof may be an estimation of the value of the goods and services.").

In sum, Beckwith is not entitled to summary judgment based on the amount of damages purportedly established by his expert report or based on Hammervold's failure to conclusively state the amount of his damages.

## IV.    CONCLUSION

For the reasons set forth herein, the defendant's Motion for Summary Judgment (Doc. No. 66) will be denied, and the plaintiff's Motion to Limit the Testimony of Defendant's Retained Expert Witness Kevin Balz (Doc. No. 57) will be denied without prejudice to the plaintiff's ability to raise the issue in a pretrial motion *in limine*.

An appropriate Order is filed herewith.


_____
ALETA A. TRAUGER
United States District Judge